NATIONAL FOOTBALL LEAGUE PROPERTIES, INC. and Green Bay Packers, Inc., Plaintiffs,

v.

PROSTYLE, INC. and Sheri Tanner, Individually, Defendants.

No. 96–C–1404.

United States District Court, E.D. Wisconsin.

April 28, 1999.

---

Howard A. Pollack, Daniel T. Flaherty, Godfrey & Kahn, Milwaukee, WI, Robert L. Raskopf, White & Case, New York City, for plaintiff.

John P. Fredrickson, Nilles & Nilles, Milwaukee, WI, for defendant.

## ORDER

STADTMUELLER, Chief Judge.

### I. OVERVIEW

Plaintiffs, National Football League Properties, Inc. and Green Bay Packers, Inc., accuse defendants ProStyle, Inc. and Sheri Tanner of unlawfully capitalizing on the Packers' success by selling unauthorized Packer merchandise. In their complaint, plaintiffs presented six counts for which they claimed relief: federal unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); federal trademark infringement under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); federal dilution under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); deceptive advertising law under Wis.Stat. § 100.18(1); common law unfair competition; common law trademark infringement; misappropriation of trade secrets under Wis.Stat. § 134.90; and common law misappropriation of trade secrets. Plaintiffs sought a temporary re-

straining order and preliminary and permanent injunctions restraining defendants' use of plaintiffs' marks and ordering destruction of infringing materials, as well as damages, including treble damages for willful and deliberate infringement under the Lanham Act, double damages under Wis.Stat. § 100.18(1), and punitive damages under Wis.Stat. § 134.90(4).

On December 30, 1996, the court held a hearing on the motion for a temporary restraining order, and on January 2, 1997, the court denied the motion. On July 25, 1997, the court granted partial summary judgment for defendants on plaintiffs' claims of federal unfair competition, federal trademark infringement, state unfair competition, and state trademark infringement to the extent these claims were based upon unregistered common law trademarks. The court denied summary judgment for defendants on these claims to the extent they were based upon plaintiffs' registered trademarks. The court also granted summary judgment for defendants on plaintiffs' deceptive advertising claim under Wis.Stat. § 100.18(1). On May 19, 1998, the court denied plaintiffs' motion for reconsideration of that decision.

On July 31, 1998, the court considered each side's motions in limine and, inter alia, granted defendants' motion to exclude the expert report and survey of plaintiffs' expert Jacob Jacoby:

Defendants' fourth argument is that the survey's confusion question, "Do you think that, in order to put out this shirt, the company that put it out *did* need to get permission, did *not* need to get permission, or you have no thoughts about this?", improperly asked for a legal conclusion. In *Novo Nordisk of North America, Inc. v. Eli Lilly & Co.*, 96 Civ. 5787, 1996 WL 497018, 1996 U.S.Dist. LEXIS 12807 (S.D.N.Y. Aug. 30, 1996), a similar question formulated by Jacoby caused the court to "discard" his survey results. *Id.* at *26, 1996 WL 497018 *6. As in this case, Jacoby asked whether the producer of the product shown "had

to get authorization" to use another's marks. *Id.* at *26 n. 26, 1996 WL 497018 *6 n. 26. The court in *Novo Nordisk* rejected all survey answers to this question because it "mistakenly ask[ed] respondents what they believe is the legal requirement (because of the use of the phrase 'had to'), rather than asking them merely whether they believed that the maker of the [product] did receive authorization to use the [marks]." *Id.* at *25 n. 24, 1996 WL 497018 *6 n. 24.

Plaintiffs respond that defendants are "nitpicking" and that Jacoby had to insert the phrase "need to get permission" or else most people would respond that they did not know whether or not the maker got permission to make the shirt. The court may have been more sympathetic to this position had Jacoby himself not formulated the same survey question rejected in *Novo Nordisk* and had that court not suggested to him what would have been acceptable. However, Jacoby apparently has not learned from his mistakes which, contrary to plaintiffs' assertions that Jacoby's surveys "have been universally relied upon" and have never been rejected by a court, seem to be numerous. *See, e.g., Novo Nordisk,* 1996 WL 497018, 1996 U.S.Dist. LEXIS 12807, at *26 n. 26; *ConAgra, Inc. v. Geo. A. Hormel & Co.,* 784 F.Supp. 700, 725–28 (D.Neb.1992) (holding that "the Jacoby study . . . must be significantly discounted" because of "serious flaws in the study"), *aff'd,* 990 F.2d 368 (8th Cir.1993); *Weight Watchers Int'l, Inc. v. Stouffer Corp.,* 744 F.Supp. 1259, 1274 (S.D.N.Y.1990) (criticizing Jacoby study and noting that "[t]his is not the first time Jacoby's survey findings have been criticized"); *Am. Home Prods. Corp. v. Barr Labs., Inc.,* 656 F.Supp. 1058, 1070 (D.N.J.) (holding that a "number of flaws in the design of [Jacoby's] survey lead me to accord very little weight to its results"), *aff'd,* 834 F.2d 368 (3rd Cir.1987); *Smith v. Ames Dep't Stores, Inc.,* 988 F.Supp. 827, 834 (D.N.J.1997) (holding that "Dr. Jacoby's failure to consider data gleaned from actual consumers limits [his opinion's] value"); *Simon & Schuster, Inc. v. Dove Audio, Inc.,* 970 F.Supp. 279, 291 (S.D.N.Y. 1997) (holding that because of flaws, "the Court assigns significantly reduced weight to the Jacoby Survey's results"); *Jim Beam Brands Co., Inc. v. Beamish & Crawford, Ltd.,* 852 F.Supp. 196, 199 (S.D.N.Y.1994) (holding that "Dr. Jacoby's study however, I find to have questionable value because his questions were leading"); *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. Partnership,* 34 F.3d 410, 416 (7th Cir.1994) (criticizing "tricks of the survey researcher's black arts" while assessing Jacoby survey); *Quality Inns Int'l, Inc. v. McDonald's Corp.,* 695 F.Supp. 198, 218–19 (D.Md. 1988) (rejecting results of Jacoby survey as irrelevant); *Worthington Foods, Inc. v. Kellogg Co.,* 732 F.Supp. 1417, 1446 (S.D.Ohio 1990) (noting flaws in Jacoby study and holding that "the Court does not place great weight on Dr. Jacoby's study").

Furthermore, defendants correctly point out that Jacoby's conclusion regarding confusion was not stated in terms of what consumers believed should have happened, as the survey question was stated, but instead was phrased in terms of what actually happened, i.e., that consumers believed "that such shirts *were* sponsored or authorized by the Green Bay Packers and/or the NFL." Jacoby Report at 31 (emphasis added). As the court has said previously, it will not "accord trademark protection based upon the public's mistaken notion of the law." July 25, 1997 Decision and Order at 26. Therefore, the court will grant defendants' motion in limine regarding all survey answers to the above question and any conclusions based on those answers. Because all four conclusions of the Jacoby study thus must be excluded from trial, the court will exclude his entire report and survey.

*National Football League Properties, Inc. v. ProStyle, Inc.,* 16 F.Supp.2d 1012, 1018–

19 (E.D.Wis.1998) (footnotes omitted). Despite excluding Jacoby's entire report and survey, the court did not preclude him from testifying because discovery was ongoing at that juncture. *See id.* at 1019.

A final pretrial conference was held on April 15, 1999, and a jury trial is set to commence on May 3, 1999. On April 20, 1999, defendants moved in limine once again, this time to exclude Jacoby's second expert report and the opinions stated therein. Defendants point out that in response to the court's previous decision excluding Jacoby's entire report and survey, Jacoby did not conduct a new survey but rather used the same survey data in a different way, allegedly to prove dilution under § 43(c) of the Lanham Act instead of secondary meaning and likelihood of confusion. To avoid the court's earlier objections to the survey, Jacoby pared the survey down to essentially one question (other than screening, clarifying, and categorizing questions): when respondents were shown several of defendants' products, they were asked, "What, if anything, do you think of when you see this shirt?" *See* Fredrickson Decl., Ex. 2 ("Jacoby's Second Report") at 18.

On April 23, 1999, plaintiffs responded to defendants' second motion in limine and filed their own second motion in limine, seeking to exclude defendants' expert's testimony and report as well as trial and deposition testimony by defendants' witnesses Reggie and Sara White. The court will now consider each side's motion in limine.

## II. DISCUSSION

### A. Defendants' Motion in Limine

According to the recent Supreme Court decision *Kumho Tire Company, Ltd. v. Carmichael,* —— U.S. ——, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the district court has a special "gatekeeping obligation" to ensure that all expert testimony "is not only relevant, but reliable." *Id.* at 1174 (quoting *Daubert v. Merrell Dow Pharma-*

*ceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). In this spirit, defendants ask the court to exercise its "gatekeeping obligation" to exclude Jacoby's second report and the opinions stated therein. The court is guided in this task by consideration of some or all of the following factors: whether Jacoby's "theory or technique . . . can be (and has been) tested"; whether it "has been subjected to peer review and publication"; whether there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786.

The court concludes that Jacoby's survey, even as edited to avoid the court's earlier criticisms of it, is seriously flawed. The main problem with the survey (as edited for the second report) is that it essentially asks only one question, "What, if anything, do you think of when you see this shirt?", without further probing, *see* 5 J. McCarthy, *Trademarks and Unfair Competition* § 32:176 (1999) ("Without further probing, such a question may well be meaningless and irrelevant."), and without showing any "control" shirt to any survey respondents or asking any control questions. *See, e.g., Major League Baseball Properties, Inc. v. Sed Non Olet Denarius, Ltd.,* 817 F.Supp. 1103, 1123–24 (S.D.N.Y. 1993) (holding that "both surveys contain a complete lack of controls rendering the data meaningless and having no evidentiary value"), *vacated pursuant to settlement,* 859 F.Supp. 80 (S.D.N.Y.1994); *see also* McCarthy, *supra,* § 32:187 (explaining need for controls to account for "background noise"); Shari Seidman Diamond, *Reference Guide on Survey Research,* in *Reference Manual on Scientific Evidence* at 249–252 (1994) (same); David H. Kaye & David A. Freeman, *Reference Guide on Statistics,* in *Reference Manual on Scientific Evidence* at 348–49 (1994) ("[O]utcome figures from a treatment group with-

out a control group reveal very little and can be misleading. Comparisons are essential."). For example, the court finds it utterly unremarkable that more than half of Wisconsinites polled shortly before the Packers' first Super Bowl appearance in nearly 30 years "thought of" the Packers when shown green and gold shirts that said "Green Bay Football" or "Green Bay P." *See* Jacoby's Second Report at 26. The court surmises that, in this state and at such a time of Packer-related frenzy, the questioners could have shown the survey respondents a green and gold Blarney stone (an example of a non-diluting use) and more than half of them would have thought of the Packers.

Jacoby's failure to include a control group or question in his second expert report is puzzling for several reasons. First, Jacoby himself has emphasized in both his testimony in other cases and in his academic writing that using a control group in surveys is "absolutely necessary." Jacob Jacoby, *Experimental Designs in Deceptive Advertising and Claim Substantiation Research*, 954 PLI/Corp 167, 176 (1991); *see also* Jacob Jacoby, Amy H. Handlin, & Alex Simonson, *Survey Evidence in Deceptive Advertising Cases Under the Lanham Act: An Historical Review of Comments from the Bench*, 954 PLI/Corp 83, 89 (1994) (emphasizing that "there can be no trustworthy or valid assessment of cause and effect unless surveys are intertwined with proper experimental designs (which, of necessity, involve the utilization of proper controls)"); *Graham Webb Int'l v. Helene Curtis Inc.*, 17 F.Supp.2d 919, 930 (D.Minn.1998) (Jacoby criticized the opposing party's expert's survey for "failure to use third party products

as a control").[1] Furthermore, when Jacoby has been asked to prepare surveys to test specifically for dilution in other cases, he has used controls. *See Hershey Foods Corp. v. Mars, Inc.*, 998 F.Supp. 500, 518 (M.D.Pa.1998).

Jacoby's failure to use controls in his second report is even more bedeviling considering that he had this control group information (however imperfect, as the court will discuss) in the survey data and in his first report but omitted·it from his second report. In his first report, Jacoby noted that half of all survey respondents were shown defendants' products and half were shown fictitious control products saying, for example, "Ellison Bay Football" or "Ellison Bay P" instead of "Green Bay Football" or "Green Bay P." *See* Fredrickson Decl., Ex. 1 ("Jacoby's First Report") at 4. Because Jacoby had this control group information available to him but omitted it from his second report, it appears logical that he chose not to use it because it is not good news for plaintiffs: roughly 30% of Wisconsin respondents "thought of" the Packers when shown the Ellison Bay shirts (a figure that would be astounding to anyone who did not live through the all-encompassing Packermania that gripped Wisconsin in late 1996). *See* Fredrickson Decl., Ex. 8. Suddenly, the impressive 50% or so of respondents making a mental association between defendants' products and the Packers (*see* Jacoby's Second Report at 25) shrinks to a net of roughly 20%,[2] a figure that the court surmises would be even lower had a less misleading and more similar control than "Ellison Bay" been used. *See Indianapolis Colts*, 34 F.3d at 415–16 (criticizing Jacoby's choice of the "Baltimore Horses"

---

1. However, despite Jacoby's emphasis on the importance of using controls, this is not the first time he has been criticized for not using them. In *ConAgra*, the district court "significantly discounted" Jacoby's survey for its lack of controls after Jacoby admitted that "it represented an omission, not having the control." 784 F.Supp. at 728.

2. In *The Gillette Company v. Wilkinson Sword, Inc.*, 89 CV 3586(KMW), 1991 U.S.Dist. LEXIS 21006 (S.D.N.Y. Jan. 9, 1991), the court approved of Jacoby's use of this "subtraction" methodology. *See id.* at \*20–21; *see also Reed–Union Corp. v. Turtle Wax, Inc.*, 77 F.3d 909 (7th Cir.1996) (affirming finding of no infringement where survey found 25% confusion but control found "noise" of 20%).

as his control for Baltimore Colts as a "trick[ ] of the survey researcher's black arts"); *see also Cumberland Packing Corp. v. Monsanto Co.*, 32 F.Supp.2d 561, 575 (E.D.N.Y.1999) (criticizing survey in NatraTaste–NutraSweet trademark dispute because "not one of the controls has a name sounding remotely like Natra-Taste"). In any event, the wide gap between the "dilution" figure plaintiffs would like to present to the jury, 50%, and the net figure that one arrives at after using even the deeply-flawed controls from Jacoby's first report, 20%, is reason enough for the court to exercise its gatekeeping function to exclude the survey evidence.[3]

Plaintiffs present several entirely feeble explanations for Jacoby's failure to employ any controls in his second expert report. First, they claim that the "what do you think of" survey question is a proper one to measure dilution because a similar "what do you think of" question was acceptable to the court in *WAWA Inc. v. Haaf*, 40 U.S.P.Q.2d 1629, 1632 (E.D.Pa. 1996), *aff'd*, 116 F.3d 471 (3d Cir.1997). However, the *WAWA* opinion nowhere describes what questions were used in the survey in that case, contrary to plaintiffs' citation.[4] Plaintiffs then argue that "dilution questions do not involve true controls within the discipline of survey research," Plaintiffs' Brief in Opposition to Defendants' Motion in Limine to Exclude the Second Report of Jacob Jacoby and the Opinions Stated Therein ("Plaintiffs' Opposition Brief") at 13, an argument directly contradicted by the fact that Jacoby has previously used controls specifically to

show dilution, as the court has pointed out. *See Hershey Foods*, 998 F.Supp. at 518.

Plaintiffs next argue that "[t]he open-ended dilution question itself contains an infinite number of controls—in the very answers provided by respondents." Plaintiffs' Opposition Brief at 13. Plaintiffs claim that answers that are entirely unrelated to the challenged indicia, such as "the beach, warmth, sports," or "it's cheap," are "automatically discounted, thereby enabling the open-ended questions to operate essentially as their own controls." *Id.* If plaintiffs mean by "discounted" that these answers are somehow excluded from consideration, that is what Jacoby would call (and has called) a "serious problem," because "[e]liminating people whose answers we do not like means we have tampered with the base of qualified respondents, namely, the denominator that must be used when calculating the percentage of qualified respondents who were misled." Jacob Jacoby, *Consumer Research in FTC versus Kraft (1991): A Case of Heads We Win, Tails You Lose?*, 954 PLI/Corp 149, 157 (1996). Even if this is not what plaintiffs mean by "discounted," the court doubts whether a single-question survey could contain its own controls when the whole concept of the "control" is that there must be separation, e.g., into groups or between questions, and then comparison between the separated parts. *See, e.g.*, Kaye & Freeman, *supra*, in *Reference Manual on Scientific Evidence* (1994) ("Comparisons are essential.").

Plaintiffs finally argue that the "Ellison Bay" and other shirts are not true "con-

---

**3.** The court's selection of the "Green Bay" and "Ellison Bay" shirts as examples is being charitable to Jacoby—if one compares Jacoby's finding that "one out of three" respondents associated the defendants' third shirt (the player name and number shirt) with the Packers, *see* Jacoby's Second Report at 26, with the control figure of 22.1–30.4%, *see* Fredrickson Decl., Ex. 8, the gap is even smaller.

**4.** The court also notes that the *WAWA* opinion relied in its dilution analysis on the so-called

"*Mead* factors" or "*Sweet* factors" (from Judge Sweet's concurrence in *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026 (2d Cir.1989)), an approach that has since been criticized by more recent federal appellate court decisions on the subject of federal dilution. *See Ringling Bros.– Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.*, 170 F.3d 449, 463 (4th Cir.1999); *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 49–50 (1st Cir.1998).

trol" shirts in any event but instead are "comparison" shirts, because a true control shirt "would have used, for instance, 'ELLISON LAKE M' in blue and red." Plaintiffs' Opposition Brief at 13. Aside from the irrelevance of this proposition, it is simply wrong—a control product must be "a product that is a non-infringing [in this case, non-diluting] product which is *similar* to the products at issue." *ConAgra*, 784 F.Supp. at 728 (criticizing Jacoby study for lack of controls) (emphasis added); *see also Indianapolis Colts*, 34 F.3d at 415–16 (criticizing Jacoby's choice of the "Baltimore Horses" as his control for Baltimore Colts as a "trick[ ] of the survey researcher's black arts"); *Cumberland Packing*, 32 F.Supp.2d at 575 (criticizing survey because "not one of the controls has a name sounding remotely like Natra-Taste"); *Nabisco v. Warner–Lambert Co.*, 32 F.Supp.2d 690, (S.D.N.Y.1999) (holding that plaintiffs' control product, Trident, was improper in survey measuring confusion between "Ice Breakers" and "Dentyne Ice" because control product "fails to capture the essence of the allegedly confusing quality at issue, namely the 'Ice' term or some variation of that theme").

The court also notes that plaintiffs did not cite a single article or paper, or for that matter any authority whatsoever, to support any of the arguments in their opposition brief, which is another reason to reject them: "Nor, despite the prevalence of [this type of] testing, does anyone refer to any articles or papers that validate [the expert's] approach." *Kumho Tire*, —— U.S. at ——, 119 S.Ct. at 1178.

The court has other concerns about the probativeness of Jacoby's survey evidence, especially in light of current developments in federal dilution case law. Recently, the United States Court of Appeal for the Fourth Circuit held that survey evidence must show more than just consumers' mental associations:

> If you seek to rely for proof of dilution only upon evidence of the mental impressions evoked in consumers upon viewing the marks, then those impressions must go beyond mere recognition of a visual similarity of the two marks to allow a reasonable inference that the junior mark's use has caused actual harm to the senior mark's selling or advertising power.

*Ringling Bros. v. Utah Div. of Travel Development*, 170 F.3d 449, 463. The court stated that a "skillfully constructed consumer survey" in a dilution case should be designed "not just to demonstrate 'mental association' of the marks in isolation, but further consumer impressions from which actual harm and cause might rationally be inferred." *Id.* at 465 (citing Patrick M. Bible, *Defining and Quantifying Dilution under the Trademark Dilution Act of 1995: Using Survey Evidence to Show Actual Dilution*, 75 U.Colo.L.Rev. 295, 327–28 (1999)).

Although plaintiffs attempt to distinguish *Ringling Brothers* by pointing out that it involved non-competing products, unlike in this case, *see WAWA*, 40 U.S.P.Q.2d at 1632 (distinguishing a similar case for this reason), the First Circuit recently reached conclusions similar to those of the *Ringling Brothers* court about the necessity of showing actual harm in a dilution case that did involve competing products. *See I.P. Lund*, 163 F.3d at 49–50. Plaintiffs also argue that "where competitive products are at issue ... harm follows *by definition* from dilution, because there has been sale in commerce of Defendants' goods, in the amount of approximately $600,000 of actual harm!" Plaintiffs' Opposition Brief at 11 (emphasis in original). However, the court cannot assume actual harm simply because defendants have made sales: "Certainly it is not plausible to think that Congress intended to protect [plaintiffs' marks] by simply assuming harm or damages based on the fact that the plaintiff will sell less if the defendant sells more." *I.P. Lund*, 163 F.3d at 50. A simple tally of defendants' sales does not suffice to show "actual harm and cause." *Ringling Bros.*, 170 F.3d 449, 465.

Thus, pursuant to *Daubert* and *Kumho Tire*, the court will exclude Jacoby's survey evidence and any conclusions he has reached based on that evidence. Plaintiffs argue, however, that the court need not exclude Jacoby's entire second report because it contains not only "conclusions, generated from the survey data, relating to dilution" (Section I of the report), which the court will exclude, but also "overall conclusions, based on Dr. Jacoby's extensive professional qualifications and experience as a social scientist and professor of marketing, concerning both dilution and likelihood of consumer confusion" (Section II of the report). Plaintiffs' Opposition Brief at 3–4. Defendants argue that Section II must be excluded because Jacoby's vague discussion in that section does not conclude with any opinion stated with "a reasonable degree of scientific certainty." *Lanza v. Poretti*, 537 F.Supp. 777, 785 (E.D.Pa.1982). For example, Jacoby asserts that among those who are familiar with the Packers, "some (likely small) proportion ... may exhibit neither dilution nor confusion" and "some larger proportion may exhibit confusion." *See* Jacoby's Second Report at 44.

 Section II of the second report is entitled "The Scientific Underpinnings of Trademark Law, with Particular Reference to Dilution and Confusion." *Id.* at 31. Throughout Section II, Jacoby mostly discusses general topics such as "how is everything that we know ... stored in our minds?" Regarding these general topics, the court finds, following *Kumho Tire* and *Daubert*, that this non-case-specific infor-

mation, standing alone, will not be of sufficient assistance to the jury to warrant allowing it to be admitted at trial: "[T]he question before the trial court was specific, not general. The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.' " *Kumho Tire*, —— U.S. at ——, 119 S.Ct. at 1178 (citing 4 J. McLaughlin, *Weinstein's Federal Evidence* ¶ 702.05[1], at 702–33 (2d ed.1998); *Advisory Committee's Note on Proposed Fed.Rule Evid. 702, Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure and Evidence: Request for Comment* 126 (1998) (stressing that district courts must "scrutinize" whether the "principles and methods" employed by an expert "have been properly applied to the facts of the case")); *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786 (holding that the court must consider "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute") (citations omitted).

The court also will exclude any references to the excluded survey in Section II, such as on pages 35 and 36 of the report where Jacoby discusses the survey and states that "it is my opinion that, with additional probing, a substantial number of additional respondents would have indicated that *defendant's garments made them think of the Green Bay Packers and/or the NFL through the Packers.*" *Id.* at 36.

Finally, regarding the case-specific conclusions Jacoby reaches in Section II,[5] the

---

5. Jacoby's conclusions are that among those familiar with the Packers who come across defendants' products while shopping for a football style shirt, "some (likely small) proportion of these people may exhibit neither dilution nor confusion," "some larger proportion may exhibit confusion of one sort or another," and finally,

> [I]f they were confused at the outset and then had this confusion rectified, or (2) if they were never confused but now came to believe that there were two independent entities that could put out or authorize mer-

chandise using green and yellow and saying "Green Bay" that bore either a "P" (which made them think of the Green Bay Packers) or a yellow helmet (likewise, a Packers' association in context), or the numeral and surname of a player for the Green Bay Packers, then such people would experience what I understand to be trademark dilution. That is, for these people, there are now at least two independent entities in mind who can use these indicia. Thus, the value of the registered marks of the Green

court may apply the *Daubert* factors to analyze the principles and methodology Jacoby used to reach these conclusions. *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). However, the generalized and unsupported nature of Jacoby's conclusions makes application of the *Daubert* factors difficult. *See Anderson v. F.J. Little Mach. Co.*, 68 F.3d 1113, 1119 (8th Cir.1995) ("Due to the conclusory nature of the engineer's expert affidavit and deposition, that determination is impossible.").[6]

The first *Daubert* factor is whether Jacoby's theories or techniques "can be (and ha[ve] been) tested." 509 U.S. at 593–94, 113 S.Ct. 2786. In this case, Jacoby's theories can and have been tested only in the most abstract way, in the sense that his statements about the general concepts of, for example, "spreading activation," "cognitive overload," and "information chunking" can and have been tested. The second factor is whether the theory "has been subjected to peer review and publication." *Id.* Again, Jacoby's theories satisfy this factor in only the most academic, non-case-specific way. The third factor is whether there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation." *Id.* Jacoby's unsupported statements fall short on this factor; indeed, the court does not know how his general statements could even be subject to a "rate of error" or any other scientific standard, for that matter. The final prong is whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786. Again, if Jacoby's general

statements satisfy this factor, they do so only in the most abstract sense.

Regardless of whether Jacoby's theories satisfy these four factors, "[h]elpfulness to the trier of fact remains the ultimate touchstone of admissibility." *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 784 (3rd Cir.1996). The court alluded to this above in excluding the general, non-case-specific information in Jacoby's report as it stands alone. Because this non-case-specific information also bears little if any relation to the unsupported conclusions at the end of Jacoby's report, *see Kumho Tire*, —— U.S. at ——, 119 S.Ct. at 1179 (holding that "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert") (citations omitted), the court concludes that Section II of Jacoby's report must be excluded from trial.

Therefore, the court will grant defendants' motion in limine to exclude the second report of Jacob Jacoby and the opinions stated therein. Because Rule 37(c)(1) and Rule 26(a)(2) the Federal Rules of Civil Procedure preclude an expert from testifying at trial regarding opinions not previously disclosed in an expert report, *see 1st Source Bank v. First Resource Fed. Credit Union*, 167 F.R.D. 61, 66–67 (N.D.Ind.1996); *Paradigm Sales, Inc. v. Weber Marking Sys., Inc.*, 880 F.Supp. 1247, 1252 (N.D.Ind.1995), the court will preclude Jacoby from offering expert testimony at trial.

### B. Plaintiffs' Motion in Limine

Plaintiffs move the court to preclude the trial testimony, deposition testimony, and expert report of defendants' expert wit-

Bay Packers as single source identifiers have come to be diluted.
Jacoby's Second Report at 44.

**6.** Plaintiffs admit in their opposition brief that Jacoby said in his deposition that "scholarly research and theories can provide a reliable basis for predicting consumer responses, but

that empirical data would be *required* to confirm consumers' reactions to a particular stimulus." Plaintiffs' Opposition Brief at 8 n. 7 (emphasis added). It is Jacoby's utter lack of empirical data in Section II that makes application of the *Daubert* factors difficult.

ness John A. Bunge and the trial and deposition testimony of Reggie and Sara White. Because Bunge's expert report contains only his review and evaluation of Jacoby's survey, which has been excluded, and because defendants state in their opposition brief that they will not call Bunge at trial in any event, the court will grant this part of plaintiffs' motion in limine, exclude Bunge's report and deposition testimony, and preclude him from offering expert testimony at trial.

Plaintiffs contend that the court must exclude the trial and deposition testimony of Reggie and Sara White because its "probative value is substantially outweighed by the danger of unfair prejudice." See Fed.R.Evid. 403. Plaintiffs argue that the Whites cannot offer any testimony having probative value because (1) Tanner is no longer pursuing her defamation claim against defendants, so the Whites' testimony regarding their opinion of Tanner's character is irrelevant; (2) plaintiffs accept the authenticity of the licensing agreements between Reggie White and defendants, so there is no need for him or any other player to testify to that fact; and (3) the Whites' relationship with Tanner came only after she conceived, designed, produced, and sold defendants' allegedly infringing merchandise. Plaintiffs argue that any probative value of the Whites' testimony is substantially outweighed by the unfair prejudice caused by their celebrity status in Wisconsin, which would tend to sway jurors and deflect attention away from the issues being tried.

Defendants respond that both Reggie and Sara White possess knowledge of the distribution or sale of defendants' merchandise. Defendants allege that Sara White assisted with the operation of defendant ProStyle's business in the latter half of 1996, as she testified at the hearing on plaintiffs' motion for a temporary restraining order, and that by virtue of her involvement in the operation of Reggie White's All Pro Shop ("the Shop"), which

defendant Sheri Tanner manages, Sara White can provide probative testimony regarding the relationship between the Shop and ProStyle. Defendants allege that Reggie White also has knowledge of the distribution or sale of defendants' merchandise by virtue of his involvement with the Shop and that other issues regarding his agreements with ProStyle besides the agreements' authenticity (which plaintiffs concede) may arise at trial. Regarding testimony the Whites could offer about Tanner's character, defendants argue that it may become relevant and admissible if Tanner's character for truthfulness is attacked at trial, see Fed.R.Evid. 608(a), as it was at the summary judgment stage. See Plaintiffs' Brief in Opposition to Defendants' Motion for Partial Summary Judgment at 23.

██ It appears to the court that both Reggie and Sara White may be able to contribute a wealth of probative testimony at trial. More importantly, regardless of the probativeness of their testimony, the court is not persuaded that calling a witness at trial is unfairly prejudicial simply because that witness happens to be a celebrity, and the court most certainly is not persuaded that any such prejudice could "substantially outweigh" the probativeness of the Whites' testimony. See People v. Cox, 53 Cal.3d 618, 280 Cal.Rptr. 692, 809 P.2d 351, 376 (1991) ("We decline to formulate a rule of admissibility premised on the extent to which a witness may or may not be known to the general public."), cert. denied, 502 U.S. 1062, 112 S.Ct. 945, 117 L.Ed.2d 114 (1992). Therefore, the court will deny this part of plaintiffs' motion in limine.

## III. CONCLUSION

For the aforementioned reasons, the court will grant defendants' motion in limine and will grant in part and deny in part plaintiffs' motion in limine.

Accordingly,

IT IS ORDERED that defendants' motion in limine to exclude the second report of Jacob Jacoby and the opinions stated therein be and the same is hereby **GRANTED;** and

IT IS FURTHER ORDERED that plaintiffs' second motion in limine to preclude evidence be and the same is hereby **GRANTED** in part and **DENIED** in part.